## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### CASE NO. 1:14-CIV-20372-WILLIAMS/SIMONTON

UNITED STATES OF AMERICA, ex rel.
BEATRIZ ARECELY AQUINO,
     Plaintiff/Relator

**JURY TRIAL DEMANDED**

vs.

UNIVERSITY OF MIAMI, a Florida nonprofit corporation,
(d/b/a UNIVERSITY OF MIAMI HOSPITAL and UNIVERSITY
OF MIAMI MILLER SCHOOL OF MEDICINE), and
DR. NESTOR DE LA CRUZ-MUNOZ,
     Defendants

---

## FIRST AMENDED QUI TAM COMPLAINT

RELATOR **BEATRIZ ARACELY AQUINO** brings this *qui tam* action in the name of the UNITED STATES OF AMERICA, and alleges as follows:

1.      This is an action by *qui tam* Relator **BEATRIZ ARACELY AQUINO** ("AQUINO") on behalf of the UNITED STATES OF AMERICA, against Defendants UNIVERSITY OF MIAMI, a Florida non-profit corporation (d/b/a UNIVERSITY OF MIAMI HOSPITAL and UNIVERSITY OF MIAMI MILLER SCHOOL OF MEDICINE) and DR. NESTOR DE LA CRUZ-MUNOZ ("MUNOZ"), to recover damages and penalties from the Defendants for false medical billing practices under Medicare.

1

2.     The UNITED STATES OF AMERICA is named as a Plaintiff in this suit because federal funds of the UNITED STATES OF AMERICA were/are paid to Defendants under the pertinent provisions of the Social Security Act, commonly referred to as "Medicare," as a result of the false claims alleged in this *Qui Tam Complaint*.

## PARTIES

3.     Relator BEATRIZ ARACELY AQUINO (hereinafter "AQUINO") is a citizen of the United States of America and resides in Miami-Dade County in the State of Florida.

4.     Defendant UNIVERSITY OF MIAMI (hereinafter "UM") is a Florida non-profit corporation that provides medical services, including services provided to Medicare eligible patients, as UNIVERSITY OF MIAMI MILLER SCHOOL OF MEDICINE (hereinafter "UM/MILLER").

5.     At all times material, UM/MILLER operated a clinic in the City of Doral in Miami-Dade County, Florida to evaluate patients for potential bariatric weight reduction surgery and employed the surgeons and the staff that operated the clinic

6.     Defendant   NESTOR   DE   LA   CRUZ-MUNOZ   (hereinafter "MUNOZ") is an individual who is a resident and a licensed physician in the state

2

of Florida.    MUNOZ is a bariatric surgeon and is the Chief of the Laporalendoscopic and Bariatric Surgery Division for UM/MILLER.

7.    Defendant UM also operates separate hospital facilities as UNIVERSITY OF MIAMI HOSPITAL (hereinafter to be referred to as "UM/HOSPITAL").

8.    At all relevant times herein, UM/HOSPITAL allowed the UM/MILLER physicians to perform non-eligible bariatric surgical procedures in order to bill Medicare for the hospital components as if related to an eligible surgical procedure.

## JURISDICTION & VENUE

9.    This action arises under the False Claims Act, 31 U.S.C. §§ 3729 *et seq.*, and this Court maintains subject matter jurisdiction over this action pursuant 31 U.S.C. § 3732(a) (False Claims Act) and 28 U.S.C. § 1331.

10.    Venue is proper in this Court pursuant to 31 U.S.C. § 3732(a) because: (i) Defendant MUNOZ resides in this district and Defendant UM (d/b/a/ UM/HOSPITAL and UM/MILLER is located in this district; (ii) all Defendants transact business in this district and did so at all times relevant to this complaint; and, as averred herein, and (iii) all Defendants committed acts proscribed by 28 U.S.C. § 3729 — acts giving rise to this action — within this district.

11.     The instant action was initially filed under seal and served on the UNITED STATES OF AMERICA ("UNITED STATES") on January 30, 2014.

12.     On August 13, 2015, the UNITED STATES filed its Notice advising that it declined to intervene in this matter.

13.     On August 25, 2015 the Court entered an *Order* lifting the seal and directed the action to be served upon the Defendants.

14.     AQUINO complied with all other conditions precedent to bringing this action.

15.     AQUINO is the original source of, and has direct and independent knowledge of, all publicly disclosed information on which any allegations herein might be deemed based, although all pertinent records are maintained by Defendants and by the UNITED STATES OF AMERICA (Medicare).

## RELATOR (AQUINO)

16.     AQUINO was first employed by UM/MILLER from late 1998 to late 2000 and again from mid-2001 until her termination on February 6, 2012.

17.     When initially employed, AQUINO was assigned to the Department of Surgery, which handled Trauma Surgery, General Surgery, and Bariatric Surgery.

18.     AQUINO was assigned the title of Patient Access Coordinator. Thereafter, AQUINO was promoted to Senior Surgical Coordinator.

4

19.     Under both titles, AQUINO performed Initial/Pre-surgical Functions and Post-surgical Functions for UM/MILLER.

20.     These functions included oversight of initial patient bill coding for the initial surgical evaluations, for follow-up visits, and for the surgical fees for patients who underwent surgery, whether paid by private insurance, Medicare, Medicaid, or self-pay.

21.     The Initial/Pre-surgical Functions included, but were not limited to, the following: intake of potential new elective surgical patients; schedule initial evaluation appointments; coordinate and make presentations at patient information sessions and support-group meetings; present verification of insurance coverage, co-payment, and deductible amounts for private insurance patients; verify Medicare and Medicaid eligibility for patients subject to said programs; quote all surgical fees and processing pertinent forms/contracts for private-pay patients; obtain surgical pre-authorizations for private insurance patients; verify that Medicare patient surgical pre-requisites are met; obtain necessary surgical authorization for Medicaid patients; ensure that all surgical pre-qualifications protocols have been met by patients prior to surgery; verify patient payment for any required co-payment and/or deductible; review and verify [and if necessary, complete and correct] the medical bill code face-sheet [also known as "Super-Bill"] provided by the physician for the pre-surgical services provided; and

thereafter submit the Super-Bill to the UM/MILLER billing department for submission to either private insurance, Medicare or Medicaid.

22.    AQUINO's Post-Surgical Functions included: obtain operative reports from the hospital; review of operative report and update patient chart; coordinate post-operative follow-up care with patient; follow-up on any billing authorization issues that arose;  review and verify [and if necessary, complete and correct] the medical bill code face-sheet [also known as "Super-Bill"] provided by the physician for the surgical services provided; and thereafter submit the Super-Bill to the UM/MILLER billing department for submission to either private insurance, Medicare or Medicaid.

23.    In late 2000, AQUINO left UM/MILLER.

24.    In mid-2001 AQUINO was rehired by UM/MILLER as the Patient Access Coordinator for the Comprehensive Treatment Unit. A few months later, AQUINO was re-assigned back the Department of Surgery as the Senior Patient Access coordinator performing the same functions she did before.

25.    AQUINO remained with the Department of Surgery in said position until 2005/2006 when she was recruited to apply for a position with UM/MILLER Division of Plastic & Reconstructive Surgery as the Manager/Senior Patient Coordinator. Her functions were essentially the same as with the Department of Surgery, with added management responsibility for the office staff.

6

26.    In December 2009, AQUINO was recruited by the UM/MILLER, Division of Laparoendoscopic and Bariatric Surgery, to work as the Senior Access Supervisor at a satellite office operated by MUNOZ, who had recently been hired by UM/MILLER as the Chief of Laparoendoscopic and Bariatric Surgery.

27.    AQUINO began this position in January 2010 and her employment was wrongfully terminated on February 6, 2012.

28.    AQUINO performed, and supervised other employees' performance of, the same functions AQUINO performed with the Department of Surgery as stated above, including extensive patient contact. The only exception is that she did not have to review the Super-Bills, as the patient records and billing system at UM/MILLER were being transitioned to a new electronic system referred to as "UChart."

29.    AQUINO's additional responsibilities with MUNOZ included: manage the office and an office staff of five (5) to eight (8) UM/MILLER employees; discuss clinical goals, operations, and practices with MUNOZ and other UM/MILLER executives; hold office staff meetings to discuss said goals, operations, and practices; handling certain billing-related and coding issues as they arose; assist to increase the caseload of potential surgical candidates for UM/MILLER and MUNOZ; access and review patient records, medical histories,

insurance information, and billing information; and interact with patients and potential patients as needed.

30.     One significant difference between how UM/MILLER and MUNOZ's office operated differently from the Department of Surgery or the Comprehensive Treatment Unit was that MUNOZ's office physically sought and collected funds from the patients for co-payments and deductibles, for self-pay patients, and for the payment of surgical fees (usually $2,500.00) from Medicare patients for MUNOZ to perform the *Vertical Sleeve Gastrectomy*, which was not approved by Medicare before June 27, 2012.

31.     One of AQUINO's additional job responsibilities for UM/MILLER and MUNOZ was to collect and supervise the collection by staff of these patient monies and to deposit same in a bank account maintained by MUNOZ and UM/MILLER.

32.     AQUINO regularly made cash and/or check bank deposits for MUNOZ and UM/MILLER at their designated bank, Bank of America.

33.     During a portion of her employment with UM/MILLER, while employed to work at MUNOZ's office, AQUINO was also additionally employed and paid directly by MUNOZ (purportedly as a "1099" independent contractor, but in actually an employee solely directed by MUNOZ) to perform custodial and miscellaneous clerical duties for MUNOZ after her regular work hours.

## **BACKGROUND & FACTUAL ALLEGATIONS**

34.   At all relevant times between since February 21, 2006, Medicare covered certain surgical weight loss procedures (bariatric surgeries), including those referred to in the medical community as *Laparoscopic Adjustable Gastric Banding* ("LAGB") and *Open and Laparoscopic Roux-en-Y Gastric Bypass* ("RYGBP"), under Sections 1862(a)(1)(A) and 1862 (a)(1)(E) of the Social Security Act.

35.   Prior to June 27, 2012, Medicare did **_not_** cover a surgical weight loss procedure known as *Vertical Sleeve Gastrectomy*, whether open or laparoscopic. The non-covered status for the *<u>Laparoscopic</u> Vertical Sleeve Gastrectomy* was removed by CMS for claims with dates of service on or after June 27, 2012.

36.   This was announced in a Decision Memorandum for CAG #00250R2 issued on June 27, 2012 by the Center for Medicare and Medicaid Services (CMS).

37.   A procedure code 43.82 for the *Laparoscopic Vertical Sleeve Gastrectomy* became effective on October 1, 2012 and published in the Federal Register, Vol. 77, No. 170, p. 533314 (August 31, 2012).

38.   At all relevant times prior to June 27, 2012, MUNOZ, through UM/HOSPITAL and UM/MILLER, performed all three of the above described procedures on respective Medicare patients.

39.     Prior to June 27, 2012, the Defendants also performed *Vertical Sleeve Gastrectomy* procedures on Medicare patients to recover monies from Medicare by falsely billing the procedures as a covered procedures, in order to allow UM/MILLER and UM/HOSPITAL to bill Medicare for other aspects of the surgical and post-surgical medical care.

40.     Further, at all relevant times hereto, Defendants MUNOZ and UM/MILLER, regularly collected the sum of TWO THOUSAND FIVE HUNDRED DOLLARS ($2,500.00) from Medicare patients prior to the surgeries, in violation of federal Medicare laws and/or regulations.

41.     The $2,500.00 was described by MUNOZ and UM/MILLER as the surgeon fee for the "surgical component" due to MUNOZ and UM/MILLER for MUNOZ's procedure of the *Vertical Sleeve Gastrectomy,* since Medicare did not cover the surgery.

42.     UM/HOSPITAL was to bill Medicare for the "hospital component" for the operating room, hospital room, medical supplies, and other in-hospital care.

43.     Other UM/MILLER departments that provided in-hospital services to the *Vertical Sleeve Gastrectomy* patients were to bill Medicare for said services independently.

44.     The patients' medical charts and records are in the exclusive possession of and maintained by the Defendants who, by firing AQUINO, have

prevented her access to records in order to specifically identify the names of the specific Medicare patients that had the unapproved procedure. AQUINO asserts that the identity of such patients can be obtained through minimal discovery in the litigation.

45.     For example, AQUINO was in charge of making the bank deposit for the $2,500.00 fees for MUNOZ and UM/MILLER when collected by cash or check.  Deposit slips maintained by the Defendants and/or copies from Bank of America identify the names of such patients. Physical and electronic records of credit card payments by some of the patients also reveal their identity. AQUINO has no present access to these records that are in the control, care, and custody of the Defendants.

46.     Other accounting records in the exclusive possession of the Defendants also reveal the exact names of the Medicare patients who paid said amount for the *Vertical Sleeve Gastrectomy.*

## OTHER CONDUCT

47.     At all relevant times, all Medicare covered surgical weight loss procedures required a body mass index (BMI) of at least 35 kg/m2 if the patient had one or more pre-morbid conditions and the patient had been previously unsuccessful with medical treatment for obesity.

48.     While AQUINO was employed with UM/MILLER, MUNOZ altered and/or instructed his office personnel to change otherwise accurate data on patient records, usually weight or height, to falsely attain a BMI index that met the minimum criteria for payment by Medicare. Some of these requests by MUNOZ were made to and/or in the presence of AQUINO.

49.     The patients' medical charts and records are in the exclusive possession of and maintained by the Defendants who, by firing AQUINO, have prevented her access to records in order to specifically identify the names of the specific patients where this occurred. AQUINO asserts that the identity of such patients will be readily obtained through discovery.

50.     One patient specific patient identifiable by AQUINO has the initials A.N. (The full name is omitted herein for privacy reasons and will be provided by other means to the Defendants and to the Court under seal).

51.     The alteration of patient data was done to purport to satisfy the minimum criteria for covered surgical procedures, irrespective of whether the actual procedure was in fact and in law covered by Medicare.

52.     Further, as part of the medical work-up prior to being qualified for any of the covered and non-covered surgeries, certain diagnostic tests are performed on patients.

53.   At the direction of MUNOZ, the diagnoses of certain patients [commonly referred to as their "pre-morbid condition(s)] were specifically, knowingly, and intentionally altered when necessary to qualify the patient for surgery and/or to seek approval for Medicare payment of the surgery.

54.   The patients' medical charts and records are in the exclusive possession of and maintained by the Defendants who, by firing AQUINO, have prevented her access to records in order to specifically identify the names of the specific patients where this occurred. AQUINO asserts that the identity of such patients will be readily obtained through discovery. AQUINO had first-hand access to and personally interacted with these patients during the course of her stated employment with the Defendants.

## **RETALIATORY BEHAVIOR**

55.   MUNOZ instructed staff to remind Medicare patients of payments MUNOZ and UM/MILLER sought to collect for his surgeon's fee.

56.   AQUINO was personally responsible by MUNOZ and UM/MILLER to collect and make sure the staff collected the $2500.00 fee for the *Vertical Sleeve Gastrectomy* from the Medicare patients.

57.   Some Medicare patients questioned the fee and/or complained personally to AQUINO and to other staff members.

58.     At the direction of MUNOZ, patients were advised by AQUINO and other staff members that Medicare would pay everything other than the surgeon's fee for the *Vertical Sleeve Gastrectomy* procedure.

59.     Having been employed by UM/MILLER for about 13 years, most of which were spent working in the surgical setting which previously included bariatric surgery, AQUINO was aware that UM/HOSPITAL and UM/MILLER could not be paid for the hospital's portion of the surgical and post-surgical components unless it was billed to Medicare as if performed on an eligible procedure.

60.     AQUINO was in a position to know that this was the reason MUNOZ and UM/MILLER only sought MUNOZ's surgeon fee from the patient, when the remaining costs associated with the surgery is several times more.

61.     In late 2011, AQUINO raised concerns several times to one of the administrators at UM/MILLER, Lilliam Dana, questioning the legality of charging/billing Medicare clients $2,500.00 to perform the non-approved *Vertical Sleeve Gastrectomy* procedure.

62.     AQUINO repeatedly and insistently raised the same legality concerns with MUNOZ, who generally responded by advising that the $2,500.00 represented his fee for the surgery. MUNOZ indicated his displeasure with AQUINO questioning him regarding same.

63.     AQUINO questioned MUNOZ on how the hospital and the other UM/MILLER providers rendering in-hospital services to the patients were paid, since no other monies were being collected from the patients for any other aspect of the unapproved surgery, particularly the hospital component.

64.     As an example: AQUINO and other staff were directed by or with the knowledge of MUNOZ to provide quotes to patients who did not have Medicare, Medicaid, or private insurance that they had to pay $18,500 for the *Vertical Sleeve Gastrectomy*. Said amount was to cover all aspects of the surgery, including the standard two (2) day hospital stay thereafter, absent any unforeseen complications. AQUINO and the staff had to collect said amount from self-pay patients. Of the $18,500.00, approximately $5,500.00 represented the surgeon's fee for MUNOZ's services. The remaining amount paid for the hospital surgical and post-surgical related expenses and the other UM/MILLER providers that rendered services at the hospital, i.e. anesthesia, etc.

65.     MUNOZ repeatedly deflected AQUINO's inquiries, again indicating his displeasure with her inquiries.

66.     AQUINO raised concerns regarding that UM/MILLER and MUNOZ were not keeping client medical files in compliance with HIPAA's (Health Insurance Accountability Act) privacy and security regulations given the manner in

which patient records were being handled openly in the office and in an unsecured manner.

67. AQUINO raised concerns regarding the inclusion of altered or inaccurate information maintained in the patient files.

68. AQUINO advised MUNOZ of her concerns regarding the fees charged to the patients, the potential HIPPA issues, and the accuracy of the medical record information, comparing his operation in the Doral office as vastly different from how the other departments at UM/MILLER operated.

69. MUNOZ advised AQUINO that he was entitled to "run his office his way" and indicated his displeasure with the subject matter raised by AQUINO.

## **RETALIATION**

70. In late 2011, MUNOZ's interaction with AQUINO began to change. MUNOZ began to contrive and manufacture issues in the office for which to find AQUINO accountable, which had not been issues in the past.

71. MUNOZ began to limit his interactions and communications with AQUINO, although she was still the person responsible to manage his office, and with whom he had always interacted.

72. For reasons associated with AQUINO's questioning of his office practices, MUNOZ discontinued employing AQUINO to provide the custodial and miscellaneous clerical work after hours.

73.     MUNOZ then fabricated allegations that AQUINO stole supplements he sold to bariatric patients and alleged that $400.00 was missing from AQUINO's desk.

74.     On February 6, 2012, AQUINO received a call from Roberto Estrada, (hereinafter "Estrada") an assistant to Rafic Warwar (hereinafter "Warwar"), an executive for UM/MILLER and second in charge of the Department of Surgery. Estrada advised AQUINO that Warwar requested to have a meeting with her the following morning.

75.     When AQUINO showed up for the meeting with Warwar on February 7, 2012, AQUINO was instead escorted to the UM security department where a security employee accused her of stealing four hundred dollars ($400) from the monies kept at her desk and supplements sold at MUNOZ's office.

76.     AQUINO denied the allegations.

77.     AQUNO advised that she is not allowed to lock her desk drawer and that other staff members are given unrestricted access to her unlocked office and unlocked desk to store collected monies, and that she had raised those security concerns in the past directly with MUNOZ.

78.     The investigator stated to AQUINO that since the money was alleged to be missing from her desk, it was her responsibility to account for it, and

suggested she simply agree to replace the funds in order to preserve her employment.

79.    The UM security employee also assured AQUINO that a full investigation of the matter would be undertaken to uncover the reason for the allegedly missing funds.

80.    Believing at that time that perhaps the alleged funds may have been misplaced or taken by others for which her employer would still hold her responsible, AQUINO agreed to replace the allegedly missing money with her own, for the sole purpose to avoid losing her job as directed by the security employee.

81.    At all times, AQUINO insisted she had no involvement with any missing funds.

82.    In a meeting later that same day with MUNOZ, MUNOZ accused AQUINO and her husband of stealing the money and supplements, falsely claiming  to have a video showing both doing such.

83.    AQUINO again denied the allegation and challenged MUNOZ to produce such a video, which MUNOZ could not do.

84.    AQUINO was not allowed to return to work.

85.    AQUINO later learned that no investigation was conducted by UM to determine what actually transpired.

86.     On February 14, 2012, AQUINO received a letter of termination from the University of Miami effective February 6, 2014.

87.     MUNOZ and others at UM/MILLER pressured the Doral Police Department to arrest AQUINO and charge her with theft, which they did.

88.     MUNOZ contrived the circumstances in order to terminate AQUINO because of her continuously raising concerns and issues as stated above, and for complaining of his illegal practices and procedures.

89.     AQUINO was forced to defend the contrived criminal charges against her and settle same.

90.     AQUINO was forced to challenge MUNOZ and UM/MILLER's false assertions before the State of Florida in order to receive unemployment compensation after her termination, which she was ultimately awarded.

### COUNT I: Violations of the False Claims Act
### *Billing for Covered Services not Performed*

91.     Each of the foregoing allegations in paragraphs 1-90 are re-alleged and incorporated hereby.

92.     As described in this *Qui Tam Complaint*, by performing *Vertical Sleeve Gastrectomy* prior to June 27, 2012, and billing Medicare for any component of the unauthorized procedure, Defendants MUNOZ, UM/HOSPITAL and UM/MILLER, directly and  by and through its officers, agents, and employees:

(i)        knowingly presented, or caused to be presented, to the United States Government, a false or fraudulent claim for payment or approval;

(ii)       knowingly made, used, or caused to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government; and

93.    Defendants authorized and ratified all the violations of the False Claims Act committed by its various officers, agents, and employees.

94.    The United States Government and the public fisc have been damaged as a result of Defendants' violations of the False Claims Act.

95.    The UNITED STATES OF AMERICA and AQUINO request a jury trial on all issues so triable.

WHEREFORE, Relator BEATRIZ AQUINO, on behalf of herself and the UNITED STATES OF AMERICA, pray:

(i)        that this Court enter a judgment against Defendants jointly and severally in an amount equal to three times the amount of damages the United States has sustained as a result of Defendants' violations of the False Claims Act;

(ii)     that this Court enter a judgment against Defendants jointly and severally for a civil penalty of $10,000 for each of Defendant's violations of the False Claims Act;

(iii)    that Relator, BEATRIZ AQUINO, recover all costs of this action, with interest, including the cost to the United States Government for its expenses related to this action;

(iv)     that Relator BEATRIZ AQUINO be awarded all reasonable attorneys' fees in bringing this action;

(v)      that in the event the United States Government proceeds with this action, Relator BEATRIZ AQUINO be awarded the maximum amount permitted by law,  an amount for bringing this action of at no less than 15 percent, but not more than 25 percent, of the proceeds of the action;

(vi)     that in the event the United States Government does not proceed with this action, Relator BEATRIZ AQUINO be awarded, the maximum amount permitted by law,  an amount for bringing this action of no less than 25 percent, but not more than 30 percent, of the proceeds of the action;

(vii)    that Relator BEATRIZ AQUINO be awarded prejudgment interest;

(viii)   that a trial by jury be held on all issues so triable; and

(ix)     that Relator BEATRIZ AQUINO and the United States of America receive all relief to which either or both may be entitled at law or in equity.

### COUNT II: Violations of the False Claims Act
### *Changing Patient Data to Seek Payment for Procedures on Non-eligible Medicare Patients*

96.   Each of the foregoing allegations in paragraphs 1-90 are re-alleged and incorporated hereby.

97.   As described in this *Qui Tam Complaint*, by changing Medicare patient data to falsely qualify the patient for an otherwise non-covered and/or non-eligible procedure, and billing Medicare, Defendants MUNOZ, UM/HOSPITAL, and UM/MILLER, directly and  by and through its officers, agents, and employees:

(i)     knowingly presented, or caused to be presented, to the United States Government, a false or fraudulent claim for payment or approval;

(ii)    knowingly made, used, or caused to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government; and

98.   Defendants authorized and ratified all the violations of the False Claims Act committed by its various officers, agents, and employees.

99.    The United States Government and the public fisc have been damaged as a result of Defendants' violations of the False Claims Act.

100.   The UNITED STATES OF AMERICA and AQUINO request a jury trial on all issues so triable.

WHEREFORE, Relator BEATRIZ AQUINO, on behalf of herself and the UNITED STATES OF AMERICA, pray:

(i)    that this Court enter a judgment against Defendants jointly and severally in an amount equal to three times the amount of damages the United States has sustained as a result of Defendants' violations of the False Claims Act;

(ii)   that this Court enter a judgment against Defendants jointly and severally for a civil penalty of $10,000 for each of Defendant's violations of the False Claims Act;

(iii)  that Relator, BEATRIZ AQUINO, recover all costs of this action, with interest, including the cost to the United States Government for its expenses related to this action;

(iv)   that Relator BEATRIZ AQUINO be awarded all reasonable attorneys' fees in bringing this action;

(v)    that in the event the United States Government proceeds with this action, Relator BEATRIZ AQUINO be awarded the maximum

amount permitted by law,  an amount for bringing this action of no less than 15 percent, but not more than 25 percent, of the proceeds of the action;

(vi)      that in the event the United States Government does not proceed with this action, Relator BEATRIZ AQUINO be awarded, the maximum amount permitted by law,  an amount for bringing this action of no less than 25 percent, but not more than 30 percent, of the proceeds of the action;

(vii)     that Relator BEATRIZ AQUINO be awarded prejudgment interest;

(viii)    that a trial by jury be held on all issues so triable; and

(ix)      that Relator BEATRIZ AQUINO and the United States of America receive all relief to which either or both may be entitled at law or in equity.

### COUNT III: Violations of the False Claims Act
### *Retaliation Against AQUINO*

101.   Each of the foregoing allegations in paragraphs 1-90 are re-alleged and incorporated hereby.

102.   As described in this *Qui Tam Complaint*, AQUINO repeatedly raised the legality of Defendants performing unapproved bariatric surgical procedures on Medicare patients,  and charging the patients $2,500.00 for the surgeon fee, in

order to falsely bill Medicare for the other surgical and post-surgical components of the surgery as if for an Medicare approved surgery.

103.   AQUINO attempted to remedy the fraud by discussing her concerns with an administrator at UM/MILLER and with MUNOZ. These actions by AQUINO were in furtherance of an effort to stop Defendants' violations of the False Claims Act.

104.   By questioning Defendants' practices and later, by repeatedly inquiring how UM/HOSPITAL and other UM/MILLER providers are paid for their participation in the unapproved surgery on Medicare patients, Defendant knew that she was engaging in a protected conduct in furtherance of the False Claims Act.

105.   Defendants UM/MILLER and MUNOZ were motivated to retaliate against Relator because of her protected conduct and contrived a situation by which to terminate her employment and attempt to discredit her.

106.   The retaliation by UM/MILLER and MUNOZ against Relator, AQUINO, violates the False Claims Act, 31 U.S.C. 3730(h).

WHEREFORE, Relator BEATRIZ AQUINO, on behalf of herself, prays:

(i)        that this Court enter a judgment declaring Defendants' actions to be unlawful and in violation of the False Claims Act;

(ii)        that Defendants be ordered to reinstate Relator, AQUINO, and provide her accumulated seniority, fringe benefits, salary, and all other rights;

(iii)       that Defendants be required to compensate AQUINO for the full value of double wages she would have earned  had it not been for Defendants' illegal treatment of Relator, with interest from the date of termination, in addition to reimbursement for lost pension, social security, experience, training opportunities and other benefits;

(iv)       that the Court award AQUINO compensatory and punitive damages as a result of Defendants' violations of the False Claims Act;

(v)        that Defendants be enjoined from retaliating against Relator, AQUINO, in any manner that violates the False Claims Act;

(vi)       that Relator, AQUINO, be awarded against Defendants the costs and expenses of this litigation and a reasonable attorneys fee; and

(vii)      such other relief as the Court deems proper.

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on January 25, 2016, I electronically filed the foregoing document with the Clerk of Court using the Court's CM/ECF system, which will send notification of such filing to Jessica E. Elliott, Assistant United States Attorney at Wifredo A. Ferrer, 99 N.E. 4th Street, Suite 300, Miami, Florida 33132, Jessica.Elliott@usdoj.gov and to Eric D. Isicoff, Esq. and Christopher M. Yannuzzi, Esq., Isicoff, Ragatz & Koenisberg, 1200 Brickell Avenue, Suite 1900, Miami, Florida 33131, isicoff@irlo.com, yannuzzi@irlo.com.   A copy is also being served by undersigned to co-counsel, Benedict P. Kuehne, Esq., Law Office of Benedict P. Kuehne, P.A., 100 S.E. 2d Street, Suite 3550, Miami, FL 33131-2154 at ben.kuehne@kuehnelaw.com.

MONTES & ASSOCIATES LAW FIRM, P.L.
Attorney for Plaintiff/Relator
16351 S. Miramar Parkway
Miramar, Fl 33027
Tel: 954-417-6100
service@monteslawfirm-florida.com

By: /s/  Juan C. Montes_____
          JUAN C. MONTES, ESQ.
          Florida Bar No.:  031313

&

LAW OFFICE OF
BENEDICT P. KUEHNE, P.A.
100 SE 2d Street, Suite 3550
Miami, FL 33131-2154
Tel: 305.789.5989
Ben.kuehne@kuehnelaw.com
efiling@kuehnelaw.com

By:     S/ Benedict P. Kuehne
          BENEDICT P. KUEHNE
          Florida Bar No. 233293